**In the Matter of Dean M. BECKNER.**

No. 08S00–0201–DI–55.

Supreme Court of Indiana.

Nov. 19, 2002.

James H. Voyles, Jennifer M. Lukemeyer, Symmes, Voyles, Zahn, Paul & Hogan, Indianapolis, IN, for the Respondent.

Donald R. Lundberg, Executive Secretary, David B. Hughes, Trial Counsel, Indianapolis, IN, for the Indiana Supreme Court Disciplinary Commission.

## DISCIPLINARY ACTION

### PER CURIAM.

Lawyer Dean M. Beckner's deliberate and purposeful dissipation of substantial client assets, for his own benefit, leads us to conclude today that he should be disbarred from the practice of law.

■ The Disciplinary Commission filed a two-count verified complaint for disciplinary action against the respondent on January 15, 2002, upon which a hearing officer appointed by this Court conducted an evidentiary hearing. Ind. Admission and Discipline Rule 23, Section 11(b). The hearing officer's report, filed August 9, 2002, is now before us. Where neither party petitions this Court for review of the hearing officer's findings we adopt the hearing officer's factual findings while reserving final judgment as to misconduct and sanction. *Matter of Campbell*, 702 N.E.2d 692 (Ind.1998). Preliminarily, we note that the respondent's admission to this state's bar in 1972 confers with us disciplinary jurisdiction.

■ Under Count 1, we now find as follows: The respondent was the president, CEO, director and attorney for a not-for-profit healthcare facility (Brethren's Home) that was loosely affiliated with a church (Church). Though technically an independent entity, in late 1994 the respondent sought and received the Church's permission to sell the facility to a for-profit entity, Brethren Healthcare Corporation (Healthcare). The resolution adopted by the Church provided that the proceeds from the sale would be used to benefit the Church.

The five directors of Brethren's Home, including the respondent, were the same five individuals who were the directors of Healthcare. Healthcare was established for the specific purpose of purchasing all the assets of Brethren's Home. The respondent was the incorporator and attorney for Healthcare. Though the shareholders as a group contributed only $5,000 to the corporation, the shareholder's agreement for Healthcare executed on November 22, 1994, provided that the fair market value of the shares was $875,000. Also, on November 22, 1994, the directors of Brethren's Home adopted a resolution calling for the sale of its assets to Healthcare. Healthcare was to pay the purchase price to Brethren's Home in 180 equal monthly installments. Brethren's Home in turn was to assign the proceeds of the sale for the use and benefit of the Church. While an assignment was never executed,

monthly payments were made to the Church for several years.

The directors of Brethren's Home, including the respondent, agreed to the sale of Brethren's Home assets to Healthcare for book value without advice from independent counsel. After the sale was authorized, but before it was completed, the respondent received a memorandum he had solicited from an accounting firm regarding the sale. The respondent never disclosed to his fellow directors of Brethren's Home the contents of this memorandum, which cautioned that a sale for less than fair market value could result in the loss of Brethren's Home's tax exempt status, cause adverse tax consequences for the directors, and constitute breach of fiduciary duty by the directors. The memorandum also noted the need for independent counsel to represent Brethren's Home, which the respondent ignored.

Further, the respondent never informed any of his Brethren's Home co-directors that, because he was the attorney for both Brethren's Home and Healthcare, he could not ethically represent both entities in the buy/sell transaction between them. Additionally, the respondent never informed any of the directors of Brethren's Home of the legal issues raised by the fact that they, including the respondent, had a direct and personal interest in the transaction as directors of the purchaser, Healthcare.

To complete the sale, Healthcare executed a promissory note signed by the respondent in favor of Brethren's Home dated December 1, 1994, in the principal amount of $2,200,000. As of the time of the sale, Brethren's Home's assets included $306,334 in cash, accounts receivable of $244,708, real estate valued at $194,104, buildings and improvements valued a $3,466,344 and furniture, fixtures and equipment valued at $491,330. Two mort-

gages against Brethren's Home property totaled about $700,000. The promissory note stated that it was secured by a real estate mortgage executed by Healthcare on December 1, 1994. This mortgage was never recorded by respondent.

On December 20, 1994, Brethren's Home executed a bill of sale to Healthcare, covering all tangible and intangible property. The next day the respondent, as president of Brethren's Home, executed a corporate warranty deed conveying five tracts, totaling about 104 acres, to Healthcare. A formal asset sale agreement was executed on February 14, 1995, which provided that Healthcare would sign any mortgage necessary to perfect Brethren's Home's security interest. However, the schedule of property accompanying the asset sale agreement provided that Brethren's Home would have a mortgage on all property involved in the sale except the four acres on which the health care center was located. This property constituted the most valuable asset being transferred to Healthcare. As with all other dealings between Brethren's Home and Healthcare, the respondent acted as counsel for both parties.

On April 28, 1995, an accounting firm notified the respondent that the actual book value of the assets of Brethren's Home was $2,352,973, but that such value was not the proper value for use in the transaction. The accountant again advised the respondent that the sale of assets should be based on fair market value. In a letter to the Church dated July 21, 1995, the respondent reported the increased book value and promised that Brethren's Home would continue making monthly payments of $15,000 until that amount was paid in full.

Over one year after the sale, in February of 1996, Healthcare executed an amendment to the promissory note in fa-

vor of Brethren's Home in the amended sum of $2,322,973. The amended note provided that it was secured by a real estate mortgage executed by Healthcare. Again, the respondent never recorded this mortgage.

In October of 1996, the respondent, in an effort to gain total control of Healthcare, arranged for two shareholders, owning 40% of the stock, to sell their shares to Healthcare for $504,000. This sale to Healthcare, orchestrated by the respondent, was completed January 15, 1997. The respondent also arranged for Healthcare to purchase the other 40% not controlled by the respondent for $500,000. This latter transaction was never completed, with those two shareholders receiving only about $50,000. After October 1996, the respondent acted as the sole director of Healthcare.

In December of 1996, the respondent organized a new corporation, BHC, LLC (BHC) with two equity members, the respondent and his wife. On January 7, 1997, the respondent and his wife authorized BHC to obtain a $200,000 loan secured by a first mortgage to purchase from Healthcare farmland that had been acquired from Brethren's Home. On the same day, Healthcare adopted a resolution, signed by the respondent, authorizing the sale of the farmland to BHC. On May 26, 1997, the respondent became aware that he was under investigation by the prosecuting attorney. On June 3, 1997, after the sale of the farmland to BHC, Healthcare executed a mortgage in favor of Brethren's Home covering some of the real estate transferred in 1994 from Brethren's Home to Healthcare, but omitting the farmland. This mortgage was recorded June 6, 1997. BHC's purchase of the farmland was possible only because the respondent had never caused the land to be encumbered by a mortgage in favor of

Brethren's Home, as required in the agreement for sale with Healthcare. At the time of this sale, the respondent was president and attorney for Brethren's Home, a director and attorney for Healthcare, and co-owner of BHC.

The respondent also caused a tract of Brethren's Home improved real estate to be conveyed to a company controlled by his adult children. On June 26, 2000, BHC conveyed a portion of the land it had purchased from Healthcare to Beckner Farms, LLC, a company in which the respondent was also president. Healthcare conveyed an additional portion of real estate to Beckner Farms, LLC, on November 3, 2000. On November 6, 2001, Beckner Farms, LLC, conveyed a portion of its real estate to "Titan", an entity that the respondent acknowledged "is basically the same as Beckner Farms."

From January 1995 through November 14, 1997, Healthcare made monthly payments to Brethren's Home, which, in turn made monthly payments to the Church. Thereafter, payments of lesser amounts were made sporadically until September 5, 2000. On September 5, 2000, the respondent, on behalf of Brethren's Home, issued a check to the Church for $7,500, which was not honored due to insufficient funds. No payments have been made to the Church by Brethren's Home since that time.

The respondent attempted to make it appear that independent counsel represented Brethren's Home, by asserting that a friend and lawyer had served as counsel for Brethren's Home beginning December 28, 1994. However, the alleged date of hiring post-dates the actions relevant to the original sale. The bill of sale from Brethren's Home and its corporate warranty deed are both dated prior to December 28, 1994. Further, the so-called independent counsel had never seen and knew

little or nothing about the documents involved in the transaction.

The Church filed a lawsuit seeking to recover its losses, to which the respondent responded by filing a claim against the Church seeking $10,000,000 in punitive damages. The health care facility has been closed and the Indiana Attorney General obtained the appointment of a receiver for Brethren's Home.

We find that the respondent violated Ind. Professional Conduct Rule 1.7(a), by representing a client, Healthcare, when the representation of the client was directly adverse to another client Brethren's Home, and where neither client was consulted nor consented to this common representation; Prof.Cond.R. 1.7(b), by representing a client where the representation was materially limited by the respondent's responsibilities to another client and by his own interests; Prof.Cond.R. 1.8(a), by entering into a business transaction with a client or knowingly acquiring an interest adverse to the client without giving the client a reasonable opportunity to seek independent legal advice; Prof.Cond.R. 1.8(b), by using information relating to the representation of a client to the disadvantage of the client where the client did not consent after consultation; Prof.Cond.R. 1.4(b) by failing to explain a matter to the extent necessary to permit a client to make informed decisions regarding the representation; and Prof.Cond.R. 1.13(d) in dealing with an organization's directors, officers, employees, members, shareholders or other constituents without explaining the identity of the client when it was apparent that the organization's interests were adverse to those of the constituents with whom the lawyer was dealing.

■ Under Count 2, we find as follows: An individual, residing in Virginia, died on September 23, 1990, leaving her entire residuary estate to Brethren's Home and appointing Brethren's Home the executor of her estate. Brethren's Home, acting through the respondent as president, qualified as co-executor of the estate. The inventory filed with the court in Virginia showed estate assets of $701,287.93. Brethren's Home received distributions from the estate totaling about $486,000. The respondent alleged substantial expenses and losses incurred in the administration of the estate.

In November 1991, the board of directors of Brethren's Home, which included the respondent, disagreed about how much the respondent should be paid for his work on the estate. The board, without any record of the respondent abstaining from the vote, resolved to let the respondent pay himself whatever he wanted for his services. In December of 1991, the respondent notified the co-executor that the respondent would charge $28,000 as the attorney for Brethren's Home and as executor. The respondent was not one of the executors. In April of 1992, the respondent acknowledged that payment of $28,000 would cover the fee due to him in regard to the estate.

However, in August of 1992, the respondent wrote to the co-executor charging an additional $11,000 fee. The board members of Brethren's Home were not advised of this request for additional fees.

There is no evidence that the respondent was admitted to practice law in Virginia. The estate was in fact represented by Virginia counsel, and the accountant for the estate classified the respondent's fees as executor or fiduciary fees, not attorney fees. Although Brethren's Home was co-executor on the estate, it never received any executor or fiduciary fees for its services.

Eventually, the respondent provided Brethren's Home with a reconciliation re-

garding his services in the estate in which he claimed to have received only $11,000. Additionally, the respondent submitted invoices to Brethren's Home for legal expenses he claimed to have earned in connection with the estate. He never supplied Brethren's Home with a statement of the work he did concerning the estate.

Under Count 2, we find that the respondent violated Prof.Cond.R. 1.5(a) by charging an unreasonable fee and Prof.Cond.R. 8.4(c) by engaging in conduct involving deceit and misrepresentation.

■ The hearing officer recommended the respondent's suspension from the practice of law for a "very significant period of time." She is correct that the misconduct is grave indeed.

In cases of similarly serious misconduct, we have imposed a sanction designed to protect the public from future harm. *Matter of Radford*, 698 N.E.2d 310 (Ind.1998) (disbarment for entry into business transactions with clients without full disclosure and appropriate safeguards and neglect of client matters), *Matter of Jarrett*, 657 N.E.2d 106 (Ind.1995) (disbarment for pattern of dereliction of duty, abandonment of client's interests and blatant disregard of financial responsibilities), *Matter of Good*, 632 N.E.2d 719 (Ind.1994) (disbarment for conflict of interest, failure to preserve client's property, dishonesty, fraud and deceit), *Matter of Meacham*, 630 N.E.2d 564 (Ind.1994) (disbarment for continuing pattern of intentionally deceptive conduct designed to convert clients' money to attorney's own use).

In this case, the respondent engaged in deliberate, preconceived schemes to deprive clients and third parties of substantial sums for his own benefit and the benefit of his family. Such premeditation indicates a very high level of culpability completely incompatible with the obli-

gations and entrustments attendant to the practice of law. *Matter of Lahey*, 660 N.E.2d 1022, 1023–24 (Ind.1996); *Matter of Helman*, 640 N.E.2d 1063, 1064 (Ind.1994). The record in this case is devoid of any factors whatsoever mitigating the severity of the respondent's acts. Accordingly, we find his conduct warrants permanent disbarment from the practice of law.

It is, therefore, ordered that the respondent, Dean M. Beckner, be disbarred. The Clerk is directed to strike his name from the Roll of Attorneys.

The Clerk of this Court is further directed to provide notice of this order in accordance with Admis.Disc.R. 23(3)(d), to provide notice of this order to the Hon. Kathy R. Smith, and to provide the clerk of the United States Court of Appeals for the Seventh Circuit, the clerk of each of the United States District Courts in this state, and the clerks of the United States Bankruptcy Courts in this state with the last known address of the respondent as reflected in the records of the Clerk.

Costs of this proceeding are assessed against the respondent.